BLESSING ANANTI, TX State Bar No. 24098944
*Attorney for Plaintiff*
*Pro Hac Vice Motion Forthcoming*
LAW OFFICE OF BLESSING ANANTI, PLLC.
12222 Merit Drive, Suite 120
Dallas, TX 75251
Telephone:  (972) 725-4115
Facsimile:   (214) 609-1434
Email:      blessing@prosperitylawfirm.com

United States Courts
Southern District of Texas
FILED

*July 22, 2020*

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| YEMI AKINOLA,<br><br>             Plaintiff,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS<br>810 Vermont Ave. NW Washington, DC 20420; and<br><br>ROBERT WILKIE, in his official capacity as Secretary of the United States Department of Veterans Affairs, 810 Vermont Ave. NW Washington, DC 20420,<br><br>             Defendants. | CAUSE NO.:<br><br>**COMPLAINT**<br><br>**CIVIL ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF:**<br><br>   (1) TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;<br>   (2) TEXAS LABOR CODE;<br><br>[JURY TRIAL DEMANDED] |

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Yemi Akinola, 3934 Calgary Circle, Missouri City, Texas 77459, alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII"), and the Texas Labor Code.

2. Plaintiff, Yemi Akinola ("Plaintiff") alleges that Janice Boatner, Plaintiff's First-Line Supervisor ("Boatner"), Cynthia Andrus, Nurse Manager ("Andrus") and Laura Marsh, Mental Health Care Line Executive ("Marsh") were at all times relevant to this claim agents of Defendant, Department of Veteran Affairs, ( "Defendant").

3. Plaintiff further alleges that Defendant, through their agents, unlawfully discriminated against and harassed Plaintiff on the basis of Plaintiff's participation in protected activity, and ultimately, retaliated against Plaintiff, which created a hostile work environment.

4. Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for Defendant's violations.

## II. THE PARTIES

5. Plaintiff, Yemi Akinola has been a Registered Nurse for more than 15 years. Plaintiff began working for the Defendant in 2014.

6. At all times relevant herein, the Defendant had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

7. Defendant, was also an "employer" within the meaning of the Texas Labor Code.

8. At all times relevant herein, Plaintiff was working as a Staff Nurse at

the geriatric mental health floor of the Michael E. DeBakey Veteran Affairs Medical Center.

9. Defendant is liable for the acts of their agents and employees as set forth below.

10. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Boatner, Andrus, and Marsh were responsible in some manner for the occurrences and injuries alleged in this complaint.

### III.   JURISDICTION AND VENUE

11. This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

12. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with the federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

13. Venue is proper in, and Defendant is subject to the personal jurisdiction of, this Court because Defendant maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

### IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. On or around October 10, 2017 Plaintiff contacted the Defendant's EEO Counselor regarding the acts set forth in this compliant.

15. Informal counseling was concluded by the Department Of Veterans Affairs Office Of Resolution Management on January 4, 2018.

16. On or around January 9, 2018, the Department Of Veterans Affairs Office Of Resolution Management issued the Plaintiff Notice Of Right To File A Discrimination Complaint.

17. Plaintiff timely filed an EEO complaint of discrimination with the Department Of Veterans Affairs Office Of Resolution Management on or around January 18, 2018.

18. On or around August 21, 2019 a bench decision was given by the assigned EEOC Administrative Judge.

19. Plaintiff timely filed an appeal to the Administrative Judge's decision with the EEOC's Office of Federal Operations on September 26, 2019. More than 180 days have elapsed since filing the appeal, and no decision has been rendered.

20. Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## V.   FACTUAL ALLEGATIONS

21. At all times material to this action, Plaintiff was employed by Defendant at Michael E. DeBakey Veteran Affairs Medical Center in Houston, Texas working on the geriatric mental health floor.

22. As part of Plaintiff's job, Plaintiff duties included supervising patient care, acting as the charge nurse for the unit, administering medication, and preparing and approving discharges of patients. When in the role of charge nurse, Plaintiff would be responsible for the other register nurses and the certified nursing assistants' working.

23. Plaintiff was initially hired by Defendant as a Staff Nurse in 2014. Plaintiff had worked at Nursing Unit ("NU") 6F for more than five years.

24. In or around April of 2017, Plaintiff was removed from patient care by Boatner and later wrongfully terminated because of an incident on NU 6F with patient care that was falsely attributed to the Plaintiff.

25. Plaintiff filed an EEO complaint for the wrongful termination and it was settled in August of 2017. Plaintiff was readmitted to NU 6F in September of 2017.

26. Upon Plaintiff's return to NU 6F, Plaintiff began experiencing harassment from supervisors and co-workers, resulting in a hostile work environment. At the time of return Plaintiff's first-line supervisor was Janie Boatner.

27. Plaintiff was subjected to an ongoing hostile work environment from the time of Plaintiff's return until August 01, 2018 when Plaintiff was temporarily assigned to a new unit and ultimately transferred.

28. On or around September 4, 2017, a NU 6F housekeeper, David Holt ("Holt"), stated to Plaintiff, in front of Emmanuel Ekhator, another coworker, that Holt was told that Plaintiff was accused of abusing a patient and that Plaintiff was only readmitted because Plaintiff had money to pay for a private attorney.

29. Plaintiff immediately reported the incident with Holt to the Administrative Nursing Officer of the Day ("ANOD"), Adonis Brown ("Brown"), and Victor Morah ("Morah"), the NU 6A Nurse Manager. Management took no actions against Holt.

30. Due to growing discomfort in NU 6F, Plaintiff, in a memorandum, sent a unit transfer request to Boatner and Andrus. Plaintiff was informed by Boatner that Plaintiff would be transferred once there was a job opening.

31. On or around October 8th of 2017, Holt approached Plaintiff in front of other coworkers and said, "Oh let me get out of here before you drag me on the floor like you did that patient." Plaintiff prepared a Report of Contact ("ROC") about the incident. Mr. Holt was eventually reprimanded and transferred from the floor.

32. Once again, Plaintiff reached out to Andrus to inquire about

transferring to another unit. Plaintiff's request was ultimately denied by Andrus and Boatner.

33. In addition, in October 2017, Plaintiff applied for a Registered Nurse position in the Prime Care Line unit. Plaintiff never heard back from the VA about Plaintiff's application.

34. During this period of time, Emmanuel Ekhator ("Ekhator") and Diana Toca ("Toca"), VA Registered Nurses, were transferred to new units based on problems they experienced with coworkers. Toca transferring from NU 6F to the substance abuse unit and Ekhator transferring from NU 6A to NU 6D

35. On or around November 19, 2017, Plaintiff was assigned a one-on-one patient. Due to safety issues such as a heightened risk of fall or of aggressive behavior, one-on-one patients must be supervised at all times.

36. Plaintiff's one-on-one patient was assigned to Erika Miller ("Miller"), NU 6F Assistant Nurse Manager, while Plaintiff took Plaintiff's 30-minute lunch break. Upon Plaintiff's return to the unit from lunch, Plaintiff found the one-on-one patient unsupervised and in a standing position. Seeing that the one-on-one patient was about to suffer a fall, which could cause serious injuries, Plaintiff ran and caught the patient.

37. Miller was required to inform her location to the charge nurse, Hari, and assign another nurse to keep a watch on the patient.

38. Plaintiff asked the charge nurse at the time, Sunitha Hari ("Hari"), about Miller's whereabouts but Hari was not aware.

39. Miller broke several safety rules of the hospital by leaving a one-on-one patient unattended and by not informing the charge nurse of her location. Miller's behavior could have caused a serious accident with a patient of a heightened risk. Due to the risk associated with Miller's absence, Plaintiff reported the incident to Boatner.

40. Boatner investigated the incident by obtaining a ROC from all parties involved; Plaintiff, Hari, Miller, and Adrienne Alexander ("Alexander"), the unit secretary.

41. When Plaintiff gave a ROC to Boatner, Miller had not yet returned to the unit. It was upon Miller's later return, that Alexander, Miller's friend, reported to Miller that Plaintiff reported Miller to Boatner. This angered Miller who requested to speak with Plaintiff along with Alexander in a separate patient room.

42. Plaintiff followed Alexander and Miller to the room where Miller began chastising Plaintiff for contacting Boatner. Miller stated that Miller had been working in the unit longer than Plaintiff and therefore Plaintiff had no right to report. Alexander, while pointing fingers in Plaintiff's face and using profanity, echoed Miller's statements and told Plaintiff that what Plaintiff did was not protocol.

43. Plaintiff reported Alexander for Alexander's profanity towards Plaintiff to Boatner and Andurs in an emailed ROC, but no actions were taken.

44. No actions were also taken regarding Miller abandoning the one-on-one patient.

45. On or around November 29, 2017, Plaintiff found an ROC written about Plaintiff by Alexander, left in the unit printer. This printer is used by everyone within the unit.

46. The ROC made disparaging remarks about Plaintiff's ability to be a team player, and about Plaintiff having displaced anger issues. The ROC was left out for public viewing. Plaintiff reported this to Boatner but received no response.

47. In December of 2017 Plaintiff requested FMLA in order to take care of Plaintiff's young son, who was sick.

48. In January of 2018 Plaintiff requested FMLA to care for an asthma attack Plaintiff suffered on the job due to the use of cleaning products.

49. Both request were denied by Boatner despite Plaintiff qualifying for FMLA and properly entering Plaintiff's FMLA requests. Plaintiff was marked AWOL on both occasions.

50. On or around May 10, 2018, a nurse from NU 6A, Rhonda Ogagba ("Ogagba"), was assigned to help during a staff shortage at NU 6F. When a nurse is transferred from another unit, the transferred nurse is not allowed to work on the "first patient admission" according to a VA policy.

51. When Ogagba arrived at NU 6F, Hari had already worked on the first patient admission and Plaintiff was working on a second patient admission. Thus, Ogagba was requested to work on the third patient admission. Ogagba however, misunderstood the NU 6F schedule and refused to work on the patient admission alleging Ogagba could not work on a first patient admission.

52. Despite all the discussion and explanations given by Plaintiff and Hari, Ogagba continued to refuse to work on the patient admission saying that Ogagba's supervisor, Morah, instructed that Ogagba could not work on a first admission.

53. Ogagba then phoned Morah, NU 6A Nurse Manager, alleged that Plaintiff was breaking the rules by giving Ogagba the first admission, which was not accurate. When Plaintiff tried to explain that Ogagba was not working on a first admission, Morah became verbally aggressive and hung up the phone.

54. Plaintiff subsequently called Michelle Batiste ("Batiste"), Nurse Manager of NU 6D, who was the shift supervisor, and explained the impasse. Batiste finally was able to convince Ogagba to work on the admission of the patient who had been waiting in the ER.

55. Plaintiff wrote a ROC about the incident and forwarded it to Boatner, Andrus and Marsh. Marsh stated that a fact finding was conducted concerning this incident and no evidence was found that Morah yelled at Plaintiff.

56. Boatner, Plaintiff's first line supervisor, did not become aware of this event until on June 29, 2018 when Boatner was responding to the affidavit served by the EEO investigator. This was due to what Boatner called an "oversight."

57. However, once aware of the situation, Boatner quickly concluded that fault was on Plaintiff. Boatner stated that Plaintiff "difficulty communicating effectively and working together as a 'team player' with most of the staff on NU6F."

58. On or around May 28, 2018 , Plaintiff assigned Najee Aleem ("Aleem"), a nurse assistant, to work on five patients' vitals.

59. Aleem was required to monitor the patients' vital signs. Aleem became upset and refused to do the job assigned by Plaintiff.

60. Plaintiff reported Aleem's refusal to ANOD. Plaintiff and another nurse, Rochel, worked on the patients' vital signs.

61. Later that day, Plaintiff noticed that Aleem left Aleem's post of monitoring high risk patients at the "day room." No one was left to cover the patient monitoring position. Plaintiff walked to Aleem, who was in the hallway outside the dayroom, to request Aleem return to Aleem's post since there was no one monitoring patients who could get injured if left unmonitored.

62. Aleem aggressively replied that Plaintiff was not Aleem's boss and should not be telling Aleem what to do.

63. Plaintiff called Boatner, who was at home on call. Plaintiff reported Aleem's insubordination earlier and at the hallway. Plaintiff was very frustrated with Aleem's behavior, by refusing to do the job with patients that were assigned to him. Boatner requested to speak with Aleem. On the phone with Boatner, Aleem called Plaintiff a liar.

64. Boatner stated that Boatner gave a verbal warning to Aleem for calling Plaintiff a liar and explained to Aleem that his behavior was unprofessional.

Boatner did not however reprimand Aleem for Aleem's refusal regarding patient care.

65. Boater later inferred that Plaintiff was to blame in this event since the witness, Livina Luxton ("Luxton"), formerly Ifeoma Ukwamedua, stated that Plaintiff's behavior towards Aleem that day was "unprofessional".

66. Boatner disregarded the fact that Luxton was unaware that Aleem had already refused a work assignment given by Plaintiff earlier that day when Boatner wrote about the 'aggressive "behavior of Plaintiff.

67. Boatner also used a ROC by Relindis Ndofor ("Ndofor") against Plaintiff dated May 1, 2018 to cast the blame on Plaintiff concerning an incident completely unrelated to the nature of this event with Aleem regarding patient care. Ndofor complains that Plaintiff pushed Ndofor's objects from one computer to another without Ndofor's permission.

68. Boatner was lenient with the serious behavior displayed by Aleem refusing work assignments by a registered nurse, which can put in jeopardy patient care, and indirectly agrees with Aleem that Plaintiff is lying or exaggerating when Plaintiff complained against Aleem who refused to do Aleem's job and left the day room when there is no one to cover for Aleem's break. Aleem ultimately got a slap on the wrist by Boatner while Plaintiff was portrayed as the harasser for moving a nurse shifting report from one desk to another.

69. On or around July 11, 2018 Boatner gave Plaintiff her Board of Nursing letter review in a public area, when Boatner was supposed to exercise discretion concerning the sensitive nature of this document.

70. On or around July 28, 2018 Plaintiff was assigned to review the last round board in the evening to make sure the patients were safe. Nurse rounding is the procedure of visiting the patients to ask questions and to check their wellbeing.

71. Nurse assistants usually do the regular rounds, but the nurses review

COMPLAINT FOR EMPLOYMENT DISCRIMINATION

the information the nurse assistants bring in after the nurse assistants visit the patients that were entered in the "round board."

72. Plaintiff was supposed to review the 7:30 pm round board. Plaintiff's shift was scheduled to end at 8:00pm. Thus, reviewing the round board was the last work Plaintiff was assigned to perform that day.

73. The nursing assistant, Aleem was assigned to do the patient round and enter the information in the round board, between 6:30 and 7:30 and make available the board to the nurse, Plaintiff, to review at 7:30pm. At 7:30pm, Plaintiff found Aleem and requested the board to finish Plaintiff's assignment. Plaintiff requested the board but Aleem told Plaintiff that Aleem was still writing on the board.

74. After 10 or 15 minutes later, Plaintiff returned and inquired whether Aleem was finished with the board. Aleem was still working on the board. The other RNs had their round reports ready. Plaintiff was the third nurse in the floor. When it was 7:50pm, Plaintiff noticed that Aleem was no longer working on the round board, so Plaintiff went to the dayroom, to get the board and review it in order to end Plaintiff's day shift. The board was on the desk.

75. Plaintiff asked Aleem whether Aleem was done with the board, and Aleem replied in a sarcastic tone "as you can see, I'm not writing on it, so, it means I'm done."

76. When Plaintiff reached out to pick up the board that was left on the desk close to Aleem, Aleem grabbed Plaintiff's forearm, squeezed Plaintiff's hand and threw Plaintiff's hand backward. Plaintiff screamed asking Aleem to let Plaintiff go. Two other coworkers were in the room, Patricia Anyakwu ("Anyakwu"), Nurising Assistant, and Sebastian Moore ("Moore"), Nursing Assistant.

77. Moore stood up and told Aleem that Aleem was wrong, and should

stop, not to grab anybody. Plaintiff was in tears and Aleem continued to abuse Plaintiff verbally saying that Plaintiff was stupid, Plaintiff didn't know how to act and by using profanity towards Plaintiff.

78. Plaintiff called the VA police. The police spoke to Plaintiff and Aleem and prepared a "narrative" with the information obtained. Aleem omitted the fact that Aleem grabbed Plaintiff's arm. Aleem also omitted this information on Aleem's statement to the police.

79. Boatner was also contacted after the assault. Plaintiff was seen the VA Emergency Room for her injuries - right elbow sprain. Plaintiff was also treated for her elbow sprain by a third-party doctor, at the Concentra Medical Center. Plaintiff was required to attend several sessions of physical therapy to recover from Plaintiff's right elbow sprain caused by the contact with Aleem.

80. A no-contact order memorandum was issued by Marsh to Plaintiff on July 30, 2018 ordering that Plaintiff had no contact with Aleem.

81. On about August 1, 2018, Marsh temporarily assigned Plaintiff to the General Mental Health Clinic.

82. A fact finding was conducted by Morah, Nurse Manager of NU 6A, and Batiste, Nurse Manager of NU 6D as authorized by Marsh, M.D., Mental Health Care Line Executive.

83. Plaintiff received a memorandum concerning the fact finding from Morah dated August 17, 2018 informing that Plaintiff had to attend a meeting scheduled for August 23, 2018 to provide information regarding the assault.

84. Plaintiff's attorney at the time, Kevin Lovelace ("Lovelace") contacted Marsh, Andrus, Boatner and Morah via email to request the assignment of a neutral party to conduct the investigation, since Morah was involved in the investigation of a claim of patient abuse filed by Plaintiff against Aleem in February 2018 and June 2018. In addition, Morah was involved in another incident

with Plaintiff, and Morah's participation in this fact finding constituted a conflict of interest. Plaintiff's management never responded to the communication, which was resent on August 23, August 28 and August 29, 2018.

85. Not surprisingly, the conclusion reached by the investigator was that there was no evidence of assaultive or aggressive behavior from Aleem towards Plaintiff. The conclusion disregarded the statement of the main witness, Moore, who clearly stated that Aleem grabbed Plaintiff's arm. No video camera was ever reviewed by the investigators in this fact finding, despite request by Plaintiff.

86. Plaintiff received a written counseling for an incident that occurred on July 14, 2018. The incident again involved Najee Aleem who was refusing to follow the work assignments designed by the Plaintiff. Plaintiff's work relationship with Aleem was very poor, with Aleem repeatedly showed insubordination towards Plaintiff and Boatner as previously discussed continuing to blame Plaintiff for the incidents with Aleem. This time, Plaintiff was simply venting her frustration with Aleem to Boatner. Nonetheless, Plaintiff was disciplined with a written counseling two months later. Boatner alleged that the counseling was issued that late because of Boatner's discussions with the Union.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Retaliation/Reprisal (Hostile Work Environment) in Violation of
Title VII of the Civil Rights Act of 1964, *as amended*,
42 U.S.C. § 2000e-3(a)

87.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 86, above.

88.   Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

89.   Plaintiff was placed back into Unit 6F after filing EEO charges against Defendant for wrongful termination.

90.   As a result of Plaintiff's past EEO activity, Defendant's agents and employees took materially adverse actions against Plaintiff, including, but not limited to, issuing disciplinary warnings; noting unfounded negative remarks on ROCs regarding Plaintiff; denying Plaintiff FMLA; ignoring Plaintiff's concerns regarding actions of Plaintiff's subordinates; denying Plaintiff's transfer requests; and instituting to other employees that Plaintiff was incompetent at job despite performance.

91.   Defendant's adverse actions constituted retaliatory workplace harassment.

92.   Plaintiff was subjected to verbal and written conduct, as well as physical harassment, by Defendant's agent and employees.

93.   Defendant's agent and employee's conduct was not welcomed by Plaintiff.

94. Defendant's agents' and employees' conduct was undertaken because of Plaintiff's past EEO activity.

95. The conduct was so severe or pervasive that reasonable persons in Plaintiff's position would find the work environment to be hostile or abusive.

96. Plaintiff believed their work environment to be hostile or abusive as a result of Defendant's agent's and employee's conduct.

97. Defendant's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

98. As a direct, legal and proximate result of Defendant's retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

99. Plaintiff is entitled to their reasonable attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF
Retaliation/Reprisal (Hostile Work Environment) in Violation
of the Texas Labor Code§ 21

100. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 99, above.

101. Texas Labor Code makes it unlawful for an employer to "retaliate or discriminates against a person who, (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing."

102. Plaintiff was placed back into Unit 6F after filing EEO charges against Defendant for wrongful termination.

103. As a result of Plaintiff's past EEO activity, Defendant's agents and

employees took materially adverse actions against Plaintiff, including, but not limited to, issuing disciplinary warnings; noting unfounded negative remarks on ROCs regarding Plaintiff; denying Plaintiff FMLA; ignoring Plaintiff's concerns regarding actions of Plaintiff's subordinates; denying Plaintiff's transfer requests; and instituting to other employees that Plaintiff was incompetent at job despite performance.

104. Defendant's adverse actions constituted retaliatory workplace harassment.

105. Plaintiff was subjected to verbal and written conduct, as well as physical harassment, by Defendant's agents and employees.

106. Defendant's agent and employee's conduct was not welcomed by Plaintiff.

107. Defendant's agents' and employees' conduct was undertaken because of Plaintiff's past EEO activity.

108. The conduct was so severe or pervasive that reasonable persons in Plaintiff's position would find the work environment to be hostile or abusive.

109. Plaintiff believed their work environment to be hostile or abusive as a result of Defendant's agent's and employee's conduct.

110. Defendant's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

111. As a direct, legal and proximate result of Defendant's retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

112. Plaintiff is entitled to their reasonable attorneys' fees and costs of suit.

## DECLARATORY RELIEF ALLEGATIONS

113. A present and actual controversy exists between Plaintiff and Defendant concerning their rights and respective duties. Plaintiff contends that Defendant violated Plaintiff's rights under Title VII, and the Texas Labor Code. Plaintiff is informed and believes and thereon alleges that the Defendant denies these allegations. Declaratory relief is therefore necessary and appropriate.

114. Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

## INJUNCTIVE RELIEF ALLEGATIONS

115. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

116. If this Court does not grant the injunctive relief sought herein, Plaintiff will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For a declaration that Defendant's actions, policies, and practices as alleged herein are unlawful;

2. For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

3. For punitive damages in an amount to be determined at trial;

4. For liquidated damages;

5. For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

6. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), Texas Civil Practice and Remedies Code § 38.001, and other laws; and

7. For such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

 Plaintiff demands a jury trial on all causes of action and claims to which Plaintiff has a right to a jury trial.

Dated: July 21, 2020        Respectfully submitted,

               Blessing Ananti
               LAW OFFICE OF BLESSING ANANTI, PLLC
               *Attorney For Plaintiff*

            By: */S/Blessing O. Ananti*
               BLESSING ANANTI

COMPLAINT FOR EMPLOYMENT DISCRIMINATION